# STATE OF MICHIGAN

# COURT OF APPEALS

---

COMERICA BANK,

       Plaintiff-Appellee,

v

PARS ICE CREAM COMPANY, INC., VAN
BORN GROUP, LLC, TUMBLEWEED GROUP,
LLC, SHELLEY TRAYWICK, MOHAMMED
SADEGHI, PARS ICE CREAM CALIFORNIA,
INC., PARS PHOENIX CASH & CARRY, INC.,
and MONTEBELLO BLS, LLC,

       Defendants-Appellants,

and

DAVOUD SADEGHI, also known as DAVID
SADEGHI,

       Defendant.

UNPUBLISHED
December 18, 2018

No. 338955
Wayne Circuit Court
LC No. 16-009140-CB

---

COMERICA BANK,

       Plaintiff-Appellee,

v

PARS ICE CREAM COMPANY, INC., VAN
BORN GROUP, LLC, TUMBLEWEED GROUP,
LLC, DAVOUD SADEGHI, also known as
DAVID SADEGHI, SHELLEY TRAYWICK,
MOHAMMED SADEGHI, PARS ICE CREAM
CALIFORNIA, INC., PARS PHOENIX CASH &
CARRY, INC., and MONTEBELLO BLS, LLC,

       Defendants,

and

No. 339516
Wayne Circuit Court
LC No. 16-009140-CB

-1-

DETROIT REAL ESTATE, LLC,

        Appellant.

_____

Before:  CAVANAGH, P.J., and SERVITTO and CAMERON, JJ.

PER CURIAM.

In this receivership action, defendants-appellants appeal as of right in Docket No. 338955 an order granting summary disposition in favor of plaintiff, Comerica Bank, and against defendants-appellants on the indebtedness due and owing to Comerica on four notes.  In Docket No. 339516, nonparty appellant, Detroit Real Estate, LLC (DRE), appeals as of right a subsequent order denying DRE's motion to set aside a stipulated order authorizing the receiver's settlement of DRE's claim to a disputed parcel of land and an order approving the sale of the receivership property.  We affirm.

## I.  FACTUAL BACKGROUND

From 2005 through 2009, Comerica made a series of loans to defendants-appellants, Pars Ice Cream Company, Inc. (Pars), Van Born Group, LLC (Van Born), and Tumbleweed Group, LLC (Tumbleweed), to finance their business operations.  Defendant Davoud Sadeghi (Davoud) was involved in the operations of and acted on behalf of these related businesses in various capacities.  He served as the president and resident agent of Pars, a business that sold wholesale ice cream products; he was a member and the resident agent of Van Born, who owned the real estate, comprised of nine parcels of land, that housed Pars's operations; and he, along with his brother, defendant-appellant Mohammed Sadeghi (Mohammed), were involved in Tumbleweed, with Davoud serving as its resident agent and manager.  Davoud's wife, Shelley Traywick (Traywick), was associated with Pars as Pars's secretary, treasurer, and director.  Davoud also served as the resident agent and president of defendants-appellants, Pars Phoenix Cash & Carry, Inc. and Pars Ice Cream California, Inc., and as the resident agent and manager of Montebello BLS, LLC.

At various times over the years, the businesses would execute notes, guarantees, security interests, and mortgages to Comerica securing payment of the indebtedness to Comerica of Pars, Van Born, and Tumbleweed.  Additionally, Davoud, Mohammed, and Traywick executed personal guaranty agreements to Comerica guaranteeing payment of the indebtedness.  Specifically, in November 2005, Traywick executed a personal guaranty to Comerica guaranteeing payment when due of all existing and future indebtedness to Comerica of Pars.  In April 2006, Tumbleweed executed an installment note to Comerica in the amount of $864,000.  The same day, Mohammed executed a personal guaranty to Comerica guaranteeing payment when due of all existing and future indebtedness to Comerica of Tumbleweed.  In June 2007, Van Born executed an installment note in the amount of $1,160,000 to Comerica.  The same day, Pars and Davoud executed guarantees to Comerica guaranteeing payment when due of all existing and future indebtedness to Comerica of Van Born.  Van Born also granted Comerica a mortgage of its real estate as security for payment of all indebtedness to Comerica of Van Born.

-2-

In January 2008, Pars executed an installment note in the amount of $1,100,000 to Comerica. The same day, Van Born executed a guaranty to Comerica guaranteeing payment when due of all existing and future indebtedness to Comerica of Pars. Van Born also executed a security agreement granting a security interest in its assets to secure payment of all indebtedness of Pars. Finally, in January 2009, Pars executed a revolving note in the amount of $1,750,000 to Comerica. The same day, Tumbleweed executed a guaranty to Comerica guaranteeing payment when due of all existing and future indebtedness to Comerica of Pars. Aside from the personal guarantees of Mohammed and Traywick, Davoud executed the notes, the guarantees of the businesses, the mortgage, and the security agreements on behalf of the businesses.[1]

By October 2, 2009, Pars had defaulted on its 2008 and 2009 notes, Van Born had defaulted on its 2007 note, and Tumbleweed had defaulted on its 2006 note. Comerica initially elected not to demand payment but, by November 2011, the notes remained in significant default and Comerica accelerated the debt and demanded payment in full from the borrowers and guarantors. The parties then executed a financing agreement, wherein Comerica agreed to forbear from further collection action in exchange for compliance with certain conditions and payment of the full indebtedness under the notes by June 30, 2014. That day arrived, and the outstanding indebtedness had not been paid in full.

By March 2015, Pars, Van Born, and Tumbleweed had terminated their business operations and were in the process of liquidating their assets. At this time, the debtors executed a liquidation agreement, wherein Comerica again agreed to forbear from further action to collect the indebtedness under the notes until December 31, 2015, while the debtors agreed to various liquidation and reporting requirements, including executing a confession of judgment authorizing the entry of an order to appoint a receiver in the event of a default. By November 30, 2015, defendants had defaulted on the liquidation agreement and Comerica terminated its forbearance period. And, on July 20, 2016, Comerica filed the instant action requesting the appointment of a receiver over the liquidation assets and entry of a judgment against the debtors and guarantors on the indebtedness due and owing under the notes.

On August 19, 2016, pursuant to the confession of judgment, the circuit court entered orders appointing a receiver over the property of Pars and Van Born and authorizing the receiver to sell the real property, subject to court approval. In November 2016, the receiver signed a purchase agreement to sell the Van Born real estate, comprising nine parcels of land, for $1,250,000. Meanwhile, in December 2016, Davoud filed for Chapter 7 bankruptcy protection. By January 31, 2017, indebtedness totaling over $3.5 million, with principal, interest, fees, and costs, remained due and owing to Comerica under the notes, including $1,434,705 on the Pars 2009 note; $584,594 on the Pars 2008 note; $1,510,445 on the Van Born note; and $54,464 on the Tumbleweed note.

On February 1, 2017, Comerica moved for summary disposition under MCR 2.116(C)(10), seeking a monetary judgment against the debtors and guarantors on the indebtedness. Comerica claimed that the business and personal guarantors, by the terms of their

---

[1] Traywick, in addition to Davoud, executed the 2009 Pars note.

clear and unambiguous guarantees, were fully liable for payment of the outstanding indebtedness under all four notes. In response, Mohammed claimed that his liability, pursuant to his 2006 guarantee of Tumbleweed's indebtedness, is confined to only the debt under the 2006 Tumbleweed note ($54,464), and he never intended to guarantee payment of any of the other loans related to Davoud's other businesses. Likewise, Traywick claimed that, when she executed her 2005 guaranty, she only intended to guarantee the indebtedness of Pars under a 2005 note, which has since been paid in full. Traywick also claimed that she was entitled to protection under the Equal Credit Opportunity Act (ECOA), 15 USC 1691 *et seq.*, which prohibits a lender from requiring a spousal guarantee as a condition of obtaining a loan. Traywick asserted that, as Davoud's spouse, her guaranty was unenforceable under the ECOA and, minimally, summary dismissal of her ECOA claim was premature because discovery regarding the circumstances surrounding the execution of her guaranty was not complete.

The circuit court granted Comerica's motion, concluding that the language of Mohammed's and Traywick's guaranties was clear and unambiguous, broadly capturing any and all existing and future indebtedness, obligations, and liabilities of the debtor, thus rendering them liable, not only for the direct borrowings of the primary debtor, but also for the indebtedness of the other entity the debtor subsequently guaranteed. Thus, with respect to Mohammed, the court found that his 2006 guaranty to Comerica, guaranteeing payment when due of all existing and future indebtedness to Comerica of Tumbleweed, captured not only the direct debt of Tumbleweed under its 2006 note, but also the debt of Pars under the 2008 and 2009 notes by virtue of its (Tumbleweed's) 2009 guarantee of all existing and future indebtedness to Comerica of Pars, which, in turn, included the debt under the 2007 Van Born note by virtue of Pars's 2007 guarantee of all existing and future indebtedness to Comerica of Van Born. Accordingly, the court found that Mohammed's guaranty captured all four notes and entered judgment against Mohammed, jointly and severally, for the total indebtedness due and owing to Comerica under the notes, totaling $3,584,208. Likewise, with respect to Traywick, her 2005 guaranty to Comerica, guaranteeing payment when due of all existing and future indebtedness to Comerica of Pars, clearly captured the debt subsequently incurred by Pars under the 2008 and 2009 notes, as well as the debt under the 2007 Van Born note by virtue of Pars's guarantee to Comerica payment of all existing and future indebtedness to Comerica of Van Born. The court also rejected, as a matter of law, Traywick's claim that her guaranty was unenforceable as a violation of the ECOA. Accordingly, the court entered judgment against Traywick, jointly and severally, for the amount of the outstanding debt due and owing Comerica on the Pars and Van Born notes, totaling $3,529,744. It is from this judgment that defendants-appellants in Docket No. 338955 appeal.

Meanwhile, the receiver continued to work to complete the sale of the Van Born real estate, comprising nine parcels of land. In the process, the receiver learned that, in November 2015, nonparty DRE had earlier acquired one of the parcels, a vacant tract of land, for $13,000 via a quit claim deed issued by the Wayne County Treasurer pursuant to a tax foreclosure sale. The receiver and Comerica, claiming that the County failed to provide Comerica with the requisite statutory notice of the tax foreclosure proceedings under MCL 211.78i, and that Comerica lacked actual notice of the foreclosure sale, filed a motion to invalidate the foreclosure judgment and DRE's deed as an unconstitutional taking of property in violation of Comerica's due process rights to notice and an opportunity to be heard. Comerica supported its motion with a sworn affidavit of Thomas Pullis (Pullis), a vice-president of Comerica responsible for the Van

Born loan, stating that neither he nor Comerica ever received notice that the County had commenced foreclosure proceedings against the subject parcel. On the eve of the hearing on the motion, DRE, believing that Comerica lacked constructive and actual notice of the tax foreclosure proceedings, agreed to settle its claim to the disputed parcel for payment of $27,000 from the proceeds of the receiver's sale of the property. In exchange, DRE agreed to release and discharge all claims of rights or interest in the parcel and execute a quit claim deed conveying the disputed parcel to the buyer or the receivership estate. Thereafter, on June 28, 2017, the court entered a stipulated order authorizing the receiver's settlement with DRE and authorizing the receiver to perform all actions necessary to effectuate the terms of the settlement with DRE. The court also entered an order approving the sale of the Van Born real estate, free and clear of liens and interests, and, among other things, directing payment from the sales proceeds of $27,000 to DRE.

Shortly after entry of the receivership orders authorizing the receiver's settlement with DRE and the sale of the Van Born property, Davoud disclosed to DRE's counsel that, prior to the foreclosure sale on the disputed parcel, Van Born's attorney had, in fact, informed Pullis via email of the pending tax foreclosure proceedings. Based on this newly discovered email, DRE moved under MCR 2.612(C)(1) to set aside the receivership orders on the grounds of mistake, misrepresentation, and fraud. DRE maintained that it was induced to settle its asserted claim to the disputed parcel because of Comerica's alleged lack of constructive or actual notice of the tax foreclosure proceedings and, according to DRE, the email showed that Comerica actually did have notice of the proceedings, and thus, Pullis falsely or mistakenly represented in his original affidavit that neither he, nor Comerica, ever received notice of any tax foreclosure sale proceedings related to the disputed parcel. Comerica maintained, in response, that, while the email provided information about tax foreclosure proceedings on a different parcel, it did not provide any notice with respect to the disputed parcel, and Pullis averred in a later affidavit that he did not recall receiving the email, nor did it provide him with notice of the pending foreclosure sale proceeding with respect to the disputed parcel. Failing to find any indication of mistake or fraud, the court refused to set aside its orders. It is from this order in Docket No. 339516 that DRE appeals.

## II. STANDARD OF REVIEW

In Docket No. 338955, defendants-appellants challenge the circuit court's grant of summary disposition against them. In *St Clair Med, PC v Borgiel*, 270 Mich App 260, 263-264; 715 NW2d 914 (2006), this Court set forth the standard for evaluating a motion brought under MCR 2.116(C)(10), as follows:

> A trial court's decision on a motion for summary disposition is reviewed de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Maiden*, [461 Mich] at 120. The moving party must specifically identify the matters that it believes have no disputed factual issues. *Id*.; MCR 2.116(G)(4). The moving party must support its position with affidavits, depositions, admissions, or other documentary evidence. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996); MCR 2.116(G)(5). Once the moving party has met this burden, the burden shifts to the opposing party to

show that a genuine issue of material fact exists. *Quinto*, [451 Mich] at 362. When the burden of proof at trial falls on the party opposing the motion, that party may not rest on mere allegations or denials in the pleadings, but must, by documentary evidence, set forth specific facts to show that there is a genuine issue for trial. *Id.*; *Maiden*, [461 Mich] at 121.

"The construction and interpretation of a contract present questions of law that we review de novo." *St Clair Med*, 270 Mich App at 264 (citation omitted). Further, the applicability of the ECOA presents an issue of law subject to de novo review. *Haynie v State*, 468 Mich 302, 306; 664 NW2d 129 (2003).

### III. THE MOHAMMED GUARANTY

Defendants-appellants claim that the circuit court erred in concluding that the scope of Mohammed's guaranty is clear and unambiguous on its face, extending beyond Tumbleweed's note and capturing the Pars and Van Born notes by virtue of Tumbleweed's subsequent guarantee of Pars's indebtedness to Comerica. We conclude that the circuit court properly construed the scope of the guaranty.

"[A] guarantor is not liable beyond the express terms of his contract." *Bandit Indus, Inc v Hobbs Int'l, Inc (After Remand)*, 463 Mich 504, 513; 620 NW2d 531 (2001) (citation omitted). The "assumption of another's debt is a substantial undertaking, and thus the courts will not assume such an obligation in the absence of a clearly expressed intention to do so." *Id.* at 512. Consequently, "a personal guarantee cannot be implied from language that fails to clearly and unambiguously reflect an intention to assume such a responsibility." *Id.* at 514. However, "[c]ontracts of guaranty are to be construed like other contracts, and the intent of the parties, as collected from the whole instrument and the subject-matter to which it applies, is to govern." *Comerica Bank v Cohen*, 291 Mich App 40, 46; 805 NW2d 544 (2010) (quotation marks and citation omitted).

> "[I]f the contractual language is clear, construction of the contract is a question of law for the court. If the contract is subject to two reasonable interpretations, factual development is necessary to determine the intent of the parties and summary disposition is therefore inappropriate. If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous. The language of a contract should be given its ordinary and plain meaning." [*Id.*, quoting *Meagher v Wayne State Univ*, 222 Mich App 700, 721-722; 565 NW2d 401 (1997) (citations omitted).]

Accordingly, "[c]lear, unambiguous, and definite contract language must be enforced as written and courts may not write a different contract for the parties or consider extrinsic evidence to determine the parties' intent." *Wausau Underwriters Ins Co v Ajax Paving Indus, Inc*, 256 Mich App 646, 650; 671 NW2d 539 (2003). "A contract that is clear and unambiguous is construed as a matter of law." *Id.*

The underlying facts pertinent to this issue are not in dispute. On April 28, 2006, Tumbleweed executed a note to Comerica with a principal amount of $864,000, of which

$54,464, together with interest, fees, and costs, remained due and unpaid at the time of the circuit court's judgment. The same day, Mohammed executed a personal guaranty to Comerica guaranteeing payment of all existing and future indebtedness to Comerica of Tumbleweed. Thereafter, on June 7, 2007, Van Born executed a note to Comerica with a principal amount of $1,160,000, of which $1,510,445, together with interest, fees, and costs, remained due and unpaid at judgment. The same day, Pars executed a guaranty to Comerica guaranteeing payment of all existing and future indebtedness to Comerica of Van Born. On January 4, 2008, Pars executed a note to Comerica with a principal amount of $1,100,000, of which $584,494, together with interest, fees, and costs, remained due and unpaid at judgment. A year later, on January 16, 2009, Pars executed another note to Comerica with a principal amount of $1,750,000, of which $1,434,705, together with interest, fees, and costs, remained due and unpaid at judgment. The same day, Tumbleweed executed a guaranty to Comerica guaranteeing payment of all existing and future indebtedness to Comerica of Pars. After defendants defaulted on all four notes, Comerica sought to recover from the debtors and guarantors the amounts due and owing under the notes.

The parties dispute the scope of Mohammed's 2006 guaranty, which provides, in pertinent part:

> As of April 28, 2006, the undersigned, for value received, unconditionally and absolutely guarantee(s) to Comerica Bank ("Bank") payment when due, whether by stated maturity, demand, acceleration or otherwise, of all existing and future indebtedness ("Indebtedness") to the Bank of TUMBLEWEED GROUP, LLC, a Michigan limited liability company ("Borrower"). Indebtedness includes without limit any and all obligations or liabilities of the Borrower to the Bank, whether absolute or contingent, direct or indirect, voluntary or involuntary, liquidated or unliquidated, joint or several, known or unknown; any and all indebtedness, obligations or liabilities for which Borrower would otherwise be liable to the Bank were it not for the invalidity, irregularity or unenforceability of them by reason of bankruptcy, insolvency or other law or order of any kind, or for any other reason; any and all amendments, modifications, renewals and/or extensions of any of the above; and all costs of collecting Indebtedness, including, without limit, attorney fees.[2]

Comerica contends that the guaranty is clear and unambiguous on its face, covering "all existing and future indebtedness" to Comerica of Tumbleweed, including "without limit any and all obligations or liabilities" of Tumbleweed to Comerica, and clearly capturing Tumbleweed's subsequent guaranty of all existing and future indebtedness to Comerica of Pars. Mohammed contends that, under his guaranty, he is only liable to Comerica for the remaining indebtedness under the 2006 Tumbleweed note. The scope of the guaranty is significant because only $54,464 remained outstanding under the Tumbleweed note at judgment. On the other hand, if the Mohammed guaranty, as Comerica contends, covers Tumbleweed's 2009 guarantee of Pars's existing and future indebtedness to Comerica, which, in turn, includes the Van Born debt by

---

[2] Each guaranty executed in this case contained identical language.

virtue of Pars's 2007 guarantee of Van Born's existing and future indebtedness to Comerica, Mohammed's liability to Comerica under his guaranty is over $3.5 million.

We agree with the circuit court that the scope of the guaranty clearly extends beyond Tumbleweed's note. The guaranty does not specifically refer to any loan or note of Tumbleweed, or any other instrument, so as to restrict the scope of its coverage to only the 2006 Tumbleweed note.[3] Instead, the language of Mohammed's guaranty is broad and expansive, guaranteeing payment of "all existing and future indebtedness" to Comerica of Tumbleweed, including "without limit any and all obligations or liabilities" of Tumbleweed to Comerica, "whether absolute or contingent, direct or indirect, voluntary or involuntary, liquidated or unliquidated, joint or several, known or unknown; any and all indebtedness, obligations or liabilities for which [Tumbleweed] would otherwise be liable to" Comerica. This language is clear and unambiguous, covering all existing and future indebtedness to Comerica of Tumbleweed and broadly extending Mohammed's liability under his guaranty beyond the Tumbleweed note to "any and all obligations or liabilities" of Tumbleweed to Comerica. See *Int'l Multifoods Corp v D & M Feed & Produce, Inc*, 470 F Supp 654, 656-658, 660 (D Neb, 1979) (The guaranty contained no reference to the promissory note executed on the same day or any other loans and "the language clearly includes items beyond the . . . promissory note and "broadly extends the obligations of the guarantor.") The Mohammed guaranty is clearly not limited to the indebtedness under the Tumbleweed note. At issue here is whether the scope of the guaranty extends to capture Tumbleweed's subsequent guarantee of the existing and future indebtedness of Pars: we conclude that it does.

The parties do not cite any Michigan case law specifically addressing this question, but a federal district court has addressed a similar guaranty in *Int'l Multifoods*, 470 F Supp at 660, which, while not binding, is instructive and persuasive to the determination of this issue. See *Holland v Trinity Health Care Corp*, 287 Mich App 524, 529 n 2; 791 NW2d 724 (2010) (citation omitted). In *Int'l Multifoods*, the court addressed whether H. Elmer Meyer's 1976 guarantee to pay Roger Moerer's indebtedness to International Multifoods Corporation (Multifoods) captured Moerer's 1973 guarantee to pay D & M Feed & Produce, Inc.'s (D & M)

---

[3] The guaranty contains no language limiting its scope to any specific debt of Tumbleweed, or limiting the amount of Mohammed's liability with respect to Tumbleweed's debt. In fact, the guaranty does not reference any note, loan, or other instrument at all, and, expressly provides that Mohammed's total obligation under the guaranty is "unlimited." And, other provisions of the guaranty indicate that it extends to indebtedness beyond Tumbleweed's original note. For instance, regarding the nature of the guaranty, the agreement expressly states, "This is a continuing Guaranty of payment and not of collection and remains effective whether the indebtedness is from time to time reduced and later increased or entirely extinguished and later reincurred." Further, the guaranty expressly provides that the guarantor may terminate his guaranty as to future indebtedness. Additionally, the guaranty expressly provides that the guaranty constitutes the entire agreement with respect to the subject matter of the guaranty, and thus, liability under the guaranty is distinct from and not tied to the note executed the same day. See *Int'l Multifoods Corp v D & M Feed & Produce, Inc*, 470 F Supp 654, 658 (D Neb, 1979).

indebtedness to Multifoods. The court in *Int'l Multifoods* construed the scope of the Meyer guaranty (containing similar language to the guaranty at issue here) broadly to capture not only Moerer's 1976 note to Multifoods, but also Moerer's obligation arising from his 1973 guaranty to pay D & M's debt to Multifoods. *Int'l Multifoods*, 470 F Supp at 656-660. Meyer contended, as Mohammed does here, that "the guaranty makes him [Meyer] liable only for the indebtedness of Moerer to Multifoods and does not make him a guarantor of Moerer's guaranty." *Id.* at 659. The court, deferring to the unambiguous language of the guaranty, disagreed and concluded, in pertinent part:

> By contrast [to cases involving guarantees with limiting language], in view of the broad and unlimited language of the April 6, 1976 guaranty [executed by Meyer], Meyer's argument must fail. "[A]ll indebtedness" of Roger Moerer, "direct or indirect, absolute or contingent" is included within Meyer's promise to pay . . . . There was no enumeration of specific obligations which restricted the scope of the Meyer guaranty. Clearly, the liability of Moerer as guarantor of D & M's debts is indirect and contingent. He is indirectly responsible as guarantor for the debts of D & M and this responsibility is contingent upon D & M's failing to pay when due. Meyer's argument would strip these terms of their meaning. Yet, it is well settled that every provision in a guaranty agreement must be given meaning by the Court, if possible.
>
> Therefore, the Court is of the opinion that it is clear from the language of the Meyer guaranty that the parties intended the guaranty to cover the secondary liability or contingent liability of Roger Moerer, as well as his primary liability. Meyer did not limit his undertaking to Moerer's debts. He expressly included a promise to pay the contingent liabilities of Roger Moerer. [*Id.* at 660 (footnotes and citations omitted).]

Similarly, the broad and expansive language of Mohammed's guaranty renders Mohammed liable, not only for the direct indebtedness to Comerica of Tumbleweed, but also for the indirect indebtedness to Comerica arising out of Tumbleweed's subsequent guaranty of the existing and future indebtedness to Comerica of Pars. Under the clear and unambiguous language of the guaranty, "all existing and future indebtedness" to Comerica of Tumbleweed, including "without limit any and all obligations or liabilities" of Tumbleweed to Comerica, "whether absolute or contingent, direct or indirect, voluntary or involuntary, liquidated or unliquidated, joint or several, known or unknown . . .", falls within the scope of Mohammed's promise to Comerica to pay Tumbleweed's indebtedness. As in *Int'l Multifoods*, the guaranty is devoid of any language restricting its scope to only Tumbleweed's note. Instead, the use of the terms "without limit" and "any and all" used to describe the "obligations or liabilities" of Tumbleweed that Mohammed promised to pay Comerica evidences the parties' clear intent that the guarantee capture all or every obligation and liability of Tumbleweed to Comerica, including, explicitly, and without limit, all indirect, contingent, or even unknown obligations or liabilities of

Tumbleweed.[4]  As in *Int'l Multifoods*, Tumbleweed's liability, as guarantor of Pars's existing and future indebtedness, was indirect and contingent.[5]  Tumbleweed was indirectly or secondarily and contingently liable to pay Pars's existing and future indebtedness when due in the event Pars does not.  See *Cohen*, 291 Mich App at 47, quoting *Bandit Indus*, 463 Mich at 507-508 n 4 (Under a guaranty, the guarantor's liability is dependent on an independent agreement by which the guarantor undertakes to pay the obligation if the primary debtor fails to do so).  Thus, it is clear that Mohammed did not limit his guarantee to only the debts of Tumbleweed.  Instead, as in *Int'l Multifoods*, Mohammed expressly included an "unconditional and absolute" promise to pay all existing and future indebtedness to Comerica of Tumbleweed, including any and all obligations and liabilities of Tumbleweed to Comerica whatever their nature.  Tumbleweed's indirect and contingent obligation, as guarantor of Pars's indebtedness, is within the scope of Mohammed's broad and comprehensive guaranty.[6]  See 85 ALR 2d 1183 ("[T]he general rule [is] that a comprehensive guaranty of debts covers both the primary and secondary liability of the principal.").  Mohammed's interpretation, as in *Int'l Multifoods*, would render the broad terms used in the guaranty, meaningless.  *Laurel Woods Apartments v Roumayah*, 274 Mich App 631, 638; 734 NW2d 217 (2007) (citation omitted) (Courts should avoid an interpretation of contract language that renders a part of the contract surplusage or nugatory).

---

[4] This Court may consult a dictionary to ascertain the plain meaning of undefined terms. *Holland*, 287 Mich App at 527-528.  The term "any" is defined, in part, as "without limit"; "every."  *Webster's New World Dictionary Second College Edition* (1984).  The word "all" is defined as "the whole extent or quantity of"; "the entire number of"; "every one of."  *Id*.  The term "obligation" is defined, in part, as "[a] formal, binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for particular person or set of persons; esp., a duty arising by contract" or "[a] legal relationship in which one person, the obligor, is bound to render a performance in favor of another."  *Black's Law Dictionary* (10th ed).  The word "liability" is defined, in part, as "[t]he quality, state, or condition of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy" or "[a] financial or pecuniary obligation in a specified amount; DEBT."  *Id*.  Tumbleweed's guaranty to Comerica to pay Pars's indebtedness is clearly an obligation or liability within the plain and ordinary meaning of the terms.

[5] The term "indirect" is defined, in pertinent part, as "not immediate; secondary."  *Webster's New World Dictionary Second College Edition* (1984).  "Contingent" is defined as "[p]ossible; uncertain; unpredictable" or "[d]ependent on something that might or might not happen in the future; conditional."  *Black's Law Dictionary* (10th ed).

[6] Tumbleweed's obligation, as guarantor of Pars's debt, is now absolute because Pars defaulted on its notes.  Likewise, Pars's obligation, as guarantor of Van Born's debt, is absolute because Van Born defaulted on its note.  The guarantees in this case are continuing guarantees of payment, which do not require Comerica to attempt to collect from the primary debtor, or proceed against any collateral, before asserting its rights against, and seeking payment from, the guarantors.  See *Cohen*, 291 Mich App at 48-49, citing *Bastian Bros Co v Brown*, 293 Mich 242, 248; 291 NW2d 644 (1940); see also *Int'l Multifoods*, 470 F Supp at 660 n 2 (citations omitted).

-10-

"Michigan law presumes that one who signs a written agreement knows the nature of the instrument so executed and understands its contents." *Watts v Polaczyk*, 242 Mich App 600, 604; 619 NW2d 714 (2000). While the "assumption of another's debt is a substantial undertaking, and thus the courts will not assume such an obligation in the absence of a clearly expressed intention to do so[,]" *Bandit Indus*, 463 Mich at 512, "[c]ontracts of guaranty are to be construed like other contracts, and the intent of the parties, as collected from the whole instrument and the subject-matter to which it applies, is to govern[,]" *Cohen*, 291 Mich App at 46 (citation and quotation omitted). Here, Mohammed executed a broad and comprehensive guaranty to Comerica to pay all existing and future indebtedness to Comerica of Tumbleweed and it is clear from its language that the parties intended its scope to extend beyond the primary or direct indebtedness of Tumbleweed and to any and all obligations or liabilities of Tumbleweed to Comerica that Tumbleweed undertook. Mohammed's guaranty, thus, clearly captures Tumbleweed's obligation to pay Comerica all the existing and future indebtedness to Comerica of Pars. In turn, Pars's indebtedness includes Van Born's debt to Comerica by virtue of its (Pars's) guaranty of all existing and future indebtedness to Comerica of Van Born. Therefore, because Pars, Van Born, and Tumbleweed all defaulted on their notes, Mohammed is "unconditionally and absolutely" liable for the outstanding indebtedness under the notes. Accordingly, the trial court did not err in granting summary disposition in favor of Comerica against Mohammed on the indebtedness of Tumbleweed, Pars, and Van Born.

The arguments advanced by Mohammed do not persuade us otherwise. Mohammed claims that he never intended to guarantee the debts of Pars and Van Born and relies on extrinsic evidence to support his argument (the fact that he did not sign, or was never asked to sign, separate guarantees for Pars and Van Born; and that Mohammed referred to himself as a guarantor of only Tumbleweed in subsequent documents). However, the guaranty expressly states that it constitutes the entire agreement of Mohammed and Comerica with respect to the guaranty. And, given the absence of any ambiguity in the Mohammed guaranty regarding its broad and all-inclusive scope, we cannot consider the extrinsic evidence relied upon by Mohammed to show his purported intent to guarantee only the direct liability of Tumbleweed. See *Wausau*, 256 Mich App at 650 ("Clear, unambiguous, and definite contract language must be enforced as written and courts may not write a different contract for the parties or consider extrinsic evidence to determine the parties' intent.").

And Mohammed's argument that the timing of his guaranty shows that he did not intend to guarantee the debts of Pars or Van Born is contrary to the plain language of the guaranty. While Mohammed correctly asserts that he executed his guaranty of Tumbleweed's indebtedness in 2006 and Tumbleweed did not execute its guaranty of Pars's indebtedness until 2009, he plainly promised to pay all existing and *future indebtedness* to Comerica of Tumbleweed, including any and all obligations or liabilities of Tumbleweed to Comerica. Additionally, the express nature of the guaranty is continuing, remaining effective "whether the [i]ndebtedness is from time to time reduced and later increased or entirely extinguished and later reincurred." And, the guaranty contains a termination provision, permitting Mohammed to terminate his obligation under the guaranty with respect to future indebtedness if he so desired. See, e.g., *Borg Warner Acceptance Corp v Shakopee Sports Ctr, Inc*, 431 NW2d 539, 541 (Minn, 1988) ("Where, as here, the guaranty contains a termination provision, the contract is not ambiguous or unclear as to duration."). Clearly, the parties intended the guarantee to extend to future indebtedness or obligations of Tumbleweed.

-11-

We also disagree with Mohammed's argument that, because the guaranty designated Tumbleweed as "Borrower" it is limited to only the note Tumbleweed undertook *as borrower*. It is evident from the language that the term "Borrower" is merely a term used to refer to Tumbleweed throughout the document, rather than a term used to define the extent of the guaranty. The guaranty does not state that Mohammed agreed to guarantee payment to Comerica of all existing and future indebtedness of Tumbleweed *as Borrower*. Instead, the guaranty includes "any and all obligations and liabilities *of the Borrower* to the Bank . . . ." Thus, contrary to Mohammed's argument, the guaranty's plain language does not "reaffirm that the indebtedness secured is that of Tumbleweed *as* 'Borrower'; i.e., on its own note." His interpretation of the use of the term "Borrower" "violates the basic principle of contract law that courts are not permitted to rewrite contracts by adding additional terms." *Cohen*, 291 Mich App at 47.[7]

Finally, we disagree with Mohammed's argument that *Seymour v Weinberg*, unpublished per curiam opinion of the Court of Appeals, issued May 17, 2005 (Docket No. 251924) "exposes the error of the trial court's expansive interpretation" of his guaranty. The guaranty in *Seymour* contained conflicting provisions as to its scope, and thus, was ambiguous. Here, there is no such ambiguity because the Mohammed guaranty does not specifically reference the Tumbleweed loan or note, or any other documents, so as to restrict the guaranty to only the Tumbleweed note.

In sum, we agree with the circuit court that the scope of Mohammed's unambiguous guaranty is broad and expansive and captures Tumbleweed's liability, as guarantor of Pars's existing and future indebtedness to Comerica, to pay Pars's indebtedness to Comerica, which, in turn, includes Van Born's debt by virtue of Pars's guarantee to pay Van Born's existing and future indebtedness to Comerica. Therefore, the court did not err in granting summary disposition in favor of Comerica against Mohammed on the indebtedness of Tumbleweed, Pars, and Van Born.

## IV. THE TRAYWICK GUARANTY

Traywick claims that the circuit court erred in granting judgment against her for the amount due and owing under the Pars and Van Born notes by virtue of her 2005 guaranty to Comerica of Pars's indebtedness. We disagree.

It is undisputed that Traywick executed her guaranty to Comerica in 2005 and it contains identical language to the Mohammed guaranty, "unconditionally and absolutely" guaranteeing to Comerica payment when due "of all existing and future indebtedness" to Comerica of Pars, including "without limit any and all obligations or liabilities" of Pars to Comerica, "whether absolute or contingent, direct or indirect, voluntary or involuntary, liquidated or unliquidated, joint or several, known or unknown; any and all indebtedness, obligations or liabilities for which

---

[7] The case of *Knoll v Chemical Bank*, unpublished per curiam opinion of the Court of Appeals, issued March 1, 2011 (Docket Nos. 295596 and 296028), which Mohammed cites on appeal, does not support his argument that "the term 'Borrower' serves to express a limitation on the scope of the guarantee."

[Pars] would otherwise be liable to [Comerica]." In 2007, Pars then executed a guaranty to Comerica guaranteeing payment of all existing and future indebtedness to Comerica of Van Born, including "without limit any and all obligations or liabilities" of Van Born to Comerica. Thereafter, Pars executed two notes to Comerica—in 2008 and in 2009. Traywick's guaranty, like Mohammed's, was sufficiently broad in scope to capture the Pars and Van Born debts. Despite Traywick's assertion that she did not intend to guarantee the later incurred indebtedness of Pars under the 2008 and 2009 notes, the guaranty's language is unambiguous evidencing the parties' clear intent that it cover all *future* indebtedness to Comerica of Pars and clearly did not confine the scope of her guarantee to the 2005 note.[8] Further, the guaranty's broad and encompassing language expresses a clear intent that the guarantee cover all future indebtedness of Pars, including "any and all obligations or liabilities" of Pars to Comerica, which captures Pars's obligation, as guarantor of Van Born's existing and future indebtedness to Comerica to pay Van Born's debt. The circuit court did not err in granting summary disposition in favor of Comerica against Traywick on the amount due and owing under the Pars and Van Born notes.

We also conclude that the circuit court properly granted summary dismissal of Traywick's claim that her guaranty was unenforceable as a violation of the Equal Credit Opportunity Act (ECOA), 15 USC 1691 *et seq*. "Congress enacted the ECOA in 1974, 'to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit.' " *RL BB Acquisition, LLC v Bridgemill Commons Dev Group, LLC*, 754 F3d 380, 383 (CA 6, 2014), quoting *Mays v Buckeye Rural Electric Coop, Inc*, 277 F3d 873, 876 (CA 6, 2002). Under the ECOA, "it [is] 'unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction [] on the basis of . . . sex or marital status," among other things." *RL BB Acquisition*, 754 F3d at 383 (alteration in original), quoting 15 USC 1691b(a). Traywick relies on the spouse-guarantor rule, which "prohibits a creditor from requiring the applicant's spouse to guarantee a credit instrument, even if the creditor requires *someone* to execute a guaranty." *RL BB Acquisition*, 754 F3d at 383 (emphasis in original), citing 12 CRS 202.7(d)(5), 12 CFR 1002.7(d)(5). Specifically, 12 CFR 1002.7(d) provides, in pertinent part:

(1) Rule for qualified applicant. Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested.

\* \* \*

(5) Additional parties. If, under a creditor's standards of creditworthiness, the personal liability of an additional party is necessary to support the credit requested, a creditor may request a cosigner, guarantor, endorser, or similar party.

---

[8] As previously noted, other provisions of the guaranty support this. There is nothing indicating that Traywick ever terminated or was released from her guaranty.

The applicant's spouse may serve as an additional party, but the creditor shall not require that the spouse be the additional party.

Under this rule, a violation of the ECOA may be asserted as an affirmative defense in an action to recover on the underlying debt, as here, and may invalidate a spouse-guarantor's guaranty. *RL BB Acquisition*, 754 F 3d at 386, 388.[9]

As explained in the official commentary to the Regulation, "The signature rules ensure that qualified applicants are able to obtain credit in their own names. Thus, when an applicant requests individual credit, a creditor generally may not require the signature of another person unless the creditor has first determined that the applicant alone does not qualify for the credit requested." 76 Fed Reg 79442, 79476 (commentary to § 1002.7(d)-1). On the other hand, "[w]hen an applicant requests individual credit but does not meet a creditor's standards, the creditor may require a cosigner, guarantor, endorser, or similar party—but cannot require that it be the spouse." 76 Fed Reg 79442, 79476 (commentary to § 1002.7(d)-2). Thus, under the ECOA " '[t]he applicant's spouse may serve as an additional party [supporting the application], but the creditor shall not require that the spouse be the additional party.' " *RL BB Acquisition*, 754 F3d at 383 (alteration in original), quoting 12 CFR 202.7(d)(5); 12 CFR 1002.7(d)(5); 76 Fed Reg 79442, 79476 (commentary to § 1002.7(d)(1)-1). However, "[a] creditor may require the personal guarantee of the partners, directors, or officers of a business, and the shareholders of a closely held corporation, even if the business or corporation is creditworthy. The requirement must be based on the guarantor's relationship with the business, however, and not on a prohibited basis." 76 Fed Reg 79422, 79477 (commentary to § 1002.7(d)(6)). For instance, "a creditor may not require guarantees only of the married officers of a business or the married shareholders of a closely held corporation." 76 Fed Reg 79422, 79477 (commentary to § 1002.7(d)(6)-1). Additionally, "[t]he rules in § 1002.7(d) bar a creditor from requiring the signature of a guarantor's spouse just as they bar the creditor from requiring the signature of an applicant's spouse. For example, although a creditor may require all officers of a closely held corporation to personally guarantee a corporate loan, the creditor may not automatically require that spouses of married officers also sign the guarantee." 76 Fed Reg 79422, 79477 (commentary to § 1002.7(d)(6)-2).

---

[9] Regulation B defines "applicant" as including "guarantors, sureties, endorsers, and similar parties." 12 CFR 202.2(e); 12 CFR 1002.2(e). As Comerica points out on appeal, the Eighth Circuit, in *Hawkins v Community Bank of Raymore*, 761 F3d 937 (CA 8, 2014), aff'd by an equally divided court, 136 S Ct 1072; 194 L Ed 2d 163 (2015), concluded that spouse-guarantors are not "applicants" as that term is statutorily defined in the ECOA. However, the *Hawkins* decision is at odds with the Sixth Circuit's decision in *RL BB Acquisition*, which adopted Regulation B's definition expressly including spouse-guarantors as applicants, and thus, spouse-guarantors are protected under the ECOA. Because *Hawkins* was affirmed by an equally divided Supreme Court, it is entitled "to no precedential value." *Mich Dep't of Civil Rights ex rel Parks v Gen Motors Corp, Fisher Body Div*, 412 Mich 610, 636; 317 NW2d 16 (1982). Thus, we follow the Sixth Circuit's interpretation in *RL BB Acquisition*, 754 F3d 380.

The circuit court rejected Traywick's claim under the ECOA, concluding that Traywick set forth no evidence to rebut evidence that she executed the guaranty as an officer of Pars. Traywick argues that summary dismissal of her claim was premature because discovery with respect to the circumstances surrounding the execution of her guaranty was not complete. "As a general rule, summary disposition is premature if granted before discovery on a disputed issue is complete." *Village of Dimondale v Grable,* 240 Mich App 553, 566; 618 NW2d 23 (2000) (citation omitted). "However, summary disposition may be proper before discovery is complete where further discovery does not stand a fair chance of uncovering factual support of the position of the party opposing the motion." *Id.* (citation omitted).

We agree with the circuit court that Traywick did not carry her burden of providing any evidence tending to support her ECOA claim. There appears to be no dispute that Traywick was an officer and director of Pars and, thus, was affiliated with Pars, whose debt she guaranteed. As the commentary to Regulation B explains, it is not a violation of the ECOA for a creditor to require the personal guarantee of the partners, directors, or officers of a business, even if the business or corporation is creditworthy. 76 Fed Reg 79422, 79477 (comment 7(d)(6)-1, concerning guarantors of closely held corporations). Traywick presented no evidence that her guarantee of Pars's indebtedness was based on anything other than her relationship or association with Pars. She did not present, by affidavit or otherwise, anything tending to rebut her status as an officer of Pars or showing that Comerica required her to execute the guarantee solely because of her status as the spouse of her husband, Davoud Sadeghi. See *RL BB Acquisition,* 754 F3d at 389 (A "court should consider whether [the spouse] has introduced any evidence that [the creditor] required *her* signature, not merely the signature of another person, as a guaranty on [the applicant's] loan."). " 'If a party opposes a motion for summary disposition on the ground that discovery is incomplete, the party must at least assert that a dispute does indeed exist and support that allegation by some independent evidence.' " *Dimondale,* 240 Mich App at 567, quoting *Bellows v Delaware McDonald's Corp,* 206 Mich App 555, 561; 522 NW2d 707 (1994). Traywick's bare assertion, without support, that further discovery *might* show that Comerica impermissibly required Traywick's guaranty because she is Davoud's spouse, is not enough to survive summary dismissal. In summary, we find no error in the circuit court's summary dismissal of Traywick's claim that her guaranty was executed in violation of the ECOA.

## V. JUDGMENT ON THE INDEBTEDNESS

Defendants-appellants finally claim that the circuit court erred in entering judgment on the indebtedness before the receiver sold the Van Born real estate securing the indebtedness. They further contend that there is no record that Comerica properly applied the sales proceeds to reduce the outstanding amount of their judgment. We disagree.

We find no impropriety in the circuit court's entry of judgment against defendants-appellants on the indebtedness before the receiver sold the Van Born real estate. Under MCR 2.601(A), a "final judgment may grant the relief to which the party in whose favor it is rendered is entitled . . . ." Here, defendants-appellants previously admitted that the notes were in default and agreed to, and there was no serious dispute as to, the amount of outstanding indebtedness under the notes. Accordingly, Comerica was entitled to a monetary judgment against the debtors and guarantors for the amount of the outstanding indebtedness. Further, with respect to the guarantors, by the term of their guarantees, Comerica was not required to proceed against the

collateral before seeking payment on the debt. Instead, the guaranty agreements are in the nature of a continuing guaranty of payment and not of collection, and thus, do not require Comerica to attempt to collect from the primary debtor, or proceed against any collateral, before asserting its rights against, and seeking payment from, the guarantors.[10] See *Cohen*, 291 Mich App at 48-50, citing *Bastian Bros Co v Brown*, 293 Mich 242, 248; 291 NW2d 644 (1940). Furthermore, we recognize that a " 'plaintiff may simultaneously pursue all of his remedies . . . *so long as plaintiff is not awarded double recovery.*' " *Cohen*, 291 Mich App at 49-50 (emphasis in original), quoting *Jim-Bob, Inc v Mehling*, 178 Mich App 71, 92; 443 NW2d 451 (1989) (quotation marks and citation omitted); see also *Dorrill v Eaton*, 35 Mich 302, 303-304 (1877) (It was improper for the creditor who recovered judgment on the full amount of his note, which was paid in full, to also sell the collateral securing the note, without crediting the sale against the judgment or accounting for the sale in any way, and the debtors could sue for and recover the amount the creditor received for the collateral). Defendants-appellants cite no authority that, under these circumstances, Comerica could not, in order to obtain satisfaction of the indebtedness owed on the notes, pursue judgment against the debtors/guarantors and sell the property held as security, albeit once Comerica collects and satisfies, in full, the amount of its claim, from either source, it would have no right to collect further. We note that the net sales proceeds Comerica recovered from the receiver's sale of the Van Born real estate, $614,903, did not satisfy the outstanding judgment on the debt, totaling more than $3.5 million, and thus, there was no double recovery.

Additionally, there is nothing to support defendants-appellants' assertion that Comerica did not account for the sale as a reduction in the amount they owed on the judgment on the indebtedness. The closing statement indicates that Comerica received the net sales proceeds of $614,903 "to pay off" the loan secured by the mortgage. Pursuant to court order, Comerica was required to apply the net sales proceeds to satisfy the outstanding indebtedness, thereby, presumably, reducing the amount owed on the judgment. To the extent defendants-appellants argue that Comerica failed to apply the net sales proceeds to reduce their judgment on the indebtedness, they did not provide any evidence to support that assertion.

We further disagree with defendants-appellants' claim that, by virtue of the circuit court's entry of judgment on the indebtedness before the sale of the Van Born real estate, they did not have the opportunity to challenge the proceeds Comerica recovered from the sale. The record reveals otherwise. At the hearing to approve the sale, defendants-appellants were represented by counsel and counsel, along with Davoud Sadeghi, were given the opportunity to, and did object to, the approval of the sale on the basis that the sales price was inadequate. No other objections were raised. On appeal, they now take issue with the $100,000 in attorney fees withheld from the sales proceeds, which arose from prior litigation involving Pars, on the basis that the fees were never verified. The record, however, reveals that defendants had the opportunity to verify or contest the amount and nature of the claimed fees, but they did not avail themselves of the

---

[10] The guaranty expressly provides that any security held by Comerica for payment of the indebtedness shall not affect the unconditional obligation of the guarantor, and that Comerica may "deal with any security without affecting in any manner the unconditional obligation of the [guarantor] under this Guaranty."

opportunity to do so. They also assert the $125,000 withheld from the sales proceeds related to the claim of DRE is "questionable" given the prior settlement of $27,000, and there has been no accounting for the additional funds. However, the record reveals that the $125,000 is in escrow, pursuant to the circuit court's order, pending DRE's appeal challenging the settlement. There is no merit to defendants-appellants' arguments.

## VI. DRE'S MOTION TO SET ASIDE RECEIVERSHIP ORDERS

In Docket No. 339516, appellant DRE, claims that the circuit court erred by refusing to set aside its stipulated order authorizing the receiver's settlement with DRE regarding the disputed parcel and order approving the sale of the property. We disagree.

"This Court reviews a trial court's decision whether to set aside a judgment under MCR 2.612 for an abuse of discretion." *Adler v Dormio*, 309 Mich App 702, 707; 872 NW2d 721 (2015). "A trial court has not abused its discretion if its decision results in an outcome within the range of principled outcomes." *Id.* Further, the interpretation and application of a court rule presents a question of law subject to de novo review. *Brecht v Hendry*, 297 Mich App 732, 736; 825 NW2d 110 (2012).

The circuit court did not abuse its discretion when it denied DRE's motion to set aside the receivership orders. See *Adler*, 309 Mich App at 707. DRE asserts that it is entitled to relief from the circuit court's orders under MCR 2.612(C)(1)(a) (mistake) and (c) (fraud, misrepresentation, or other misconduct). This case involves a stipulated order authorizing the settlement. "As a general rule, settlement agreements are final and cannot be modified." *Smith v Smith*, 292 Mich App 699, 702; 823 NW2d 114 (2011). However, a stipulation may be set aside where there is evidence of mistake or fraud. *Limbach v Oakland Co Bd of Co Rd Comm'rs*, 226 Mich App 389, 394; 573 NW2d 336 (1997). "If, at time of the settlement, the parties had access to the information on which the allegations of error or fraud are now based, their compromise should not be disturbed." *Villadsen v Villadsen*, 123 Mich App 472, 477; 333 NW2d 311 (1983); see also MCR 2.612(C)(1)(b).

DRE first sought to set aside the receivership orders under MCR 2.612(C)(1)(a), which permits the court to relieve a party from a final judgment or order on the grounds of "[m]istake, inadvertence, surprise, or excusable neglect." "Mistake" for purposes of setting aside an order under MCR 2.612(C)(1)(a) means "mutual mistake." See *Villadsen*, 123 Mich App at 476-477. " 'Mutual mistake is where the parties have a common intention, but it is induced by a common [error].' " *Id.*, quoting *Black's Law Dictionary* (4th ed). Accordingly, a court has the authority to set aside a judgment or order if "both parties share a mistaken belief which led to their consent to a settlement[.]" *Villadsen*, 123 Mich App at 477.

Here, DRE failed to demonstrate that the parties were mutually mistaken when they stipulated to the settlement agreement regarding the disputed parcel. DRE purportedly agreed to settle its claim regarding the parcel based on the fact that the Wayne County Treasurer failed to provide Comerica with the requisite statutory notice of the tax foreclosure sale proceedings regarding the parcel, and Comerica, as indicated by Pullis's original affidavit, never received actual notice of the proceedings. According to DRE, because Wayne County failed to provide statutory notice under MCL 211.78i(2) to (5), the lack of actual notice induced DRE to settle as

-17-

it would constitute a constitutionally impermissible taking of Comerica's property by the County in violation of Comerica's due process rights to notice and the opportunity to be heard, thereby jeopardizing the validity of the foreclosure judgment and DRE's quit-claim deed. See *Jones v Flowers*, 547 US 220, 223, 234; 126 S Ct 1708; 164 L Ed 2d 415 (2006), quoting *Mullane v Central Hanover Bank & Trust Co*, 339 US 306, 313; 70 S Ct 652; 94 L Ed 865 (1950) ("Before a State may take property and sell it for unpaid taxes, the Due Process Clause of the Fourteenth Amendment requires the government to provide the owner 'notice and opportunity for hearing appropriate to the nature of the case.' "); *Gillie v Genesee Co Treasurer*, 277 Mich App 333, 355-356 n 12; 745 NW2d 137 (2007) ("Fundamental requirements of due process are satisfied if a party received actual notice."). DRE contends that the parties were mutually mistaken about Comerica's purported lack of actual notice of the pending tax foreclosure sale proceedings regarding the disputed parcel.

To support its position, DRE relied on the email discovered after the circuit court's entry of the stipulated order authorizing the settlement and its order approving the sale of the property. However, we agree with the circuit court that the email upon which DRE relies did not provide Comerica with actual notice that the Wayne County Treasurer had commenced tax foreclosure sale proceedings against the subject parcel, nor was Comerica aware of such proceedings. The email did not include a notice of foreclosure sale for the disputed parcel (it did, however, include a notice of foreclosure sale from the County for a different parcel comprising the Van Born property); did not state that the County had sent a foreclosure sale notice regarding the subject parcel to Van Born or anyone else; and did not state that the Treasurer had commenced tax foreclosure sale proceedings with respect to the subject parcel. While one of the attachments included with the email was a screen printout from the County's "Property & Tax Information" system for the subject parcel, indicating that the 2012 taxes were unpaid and "Subject to Foreclosure," this did not indicate that the County had commenced tax foreclosure sale proceedings with respect to the parcel. See *Jones*, 547 US at 232-233, quoting *Mennonite Bd of Missions v Adams*, 462 US 791, 800; 103 S Ct 2706; 77 L Ed 2d 180 (1983) ("An interested party's 'knowledge of delinquency in the payment of taxes is not equivalent to notice that a tax sale is pending.' "). Further, in a supplemental sworn affidavit, Pullis stated that he did not recall the email and was not aware of the foreclosure proceedings with respect to the subject parcel.

On these facts, we agree with the circuit court that DRE has not demonstrated that the parties' belief that Comerica did not have either constructive or actual notice of the tax foreclosure proceedings regarding the subject parcel, which purportedly induced DRE to settle its claim, was mistaken. The email, upon which DRE relies, did not provide Comerica with notice that the County had commenced foreclosure sale proceedings with respect to the parcel. Thus, DRE failed to establish grounds for relief from the circuit court orders on the basis of mutual mistake under MCR 2.612(C)(1)(a). See *Villadsen*, 123 Mich App at 477.

For the same reasons, DRE also cannot demonstrate grounds for relief under MCR 2.612(C)(1)(c) on the basis of misrepresentation or fraud. DRE asserts that the email shows that Comerica misled DRE into settling its claim to the disputed parcel by fraudulently or innocently misrepresenting that it never received actual notice of the impending tax foreclosure sale. To establish fraudulent misrepresentation:

-18-

it must appear: (1) [t]hat defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that is should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery. [*Titan Ins Co v Hyten*, 491 Mich 547, 555; 817 NW2d 562 (2012) (quotation marks and citations omitted).]

Innocent misrepresentation is also recognized, "if there was in fact a misrepresentation, though made innocently, and its deceptive influence was effective[.]" *Id.* at 556 (quotation marks and citations omitted).

DRE argues that Comerica misrepresented, through the original affidavit of Pullis, that Comerica lacked actual notice of the County's tax foreclosure sale proceedings with respect to the subject parcel. As before, DRE points to the email sent by Van Born's attorney to Comerica that DRE discovered after the court entered the stipulated order authorizing the receiver's settlement with DRE and the order approving the sale. That email, as discussed, failed to establish that Pullis's original representation—that neither he nor Comerica ever received notice that the County had commenced foreclosure proceedings with respect to the disputed parcel— was false or incorrect. See *id.* at 555. And, as the circuit court found, the information regarding the email upon which DRE relied to support its motion to set aside the settlement was "in the hands of" Van Born's counsel all the time and could have been identified before the settlement. "If, at time of the settlement, the parties had access to the information on which the allegations of error or fraud are now based, their compromise should not be disturbed." *Villadsen*, 123 Mich App at 477. The circuit court did not abuse its discretion in concluding that there was no basis in misrepresentation or fraud to set aside its receivership orders concerning the disputed parcel.

We also agree that the court did not abuse its discretion in declining to conduct an evidentiary hearing on the alleged fraud or misrepresentation. "Generally, where a party alleges that a fraud has been committed on the court, it is an abuse of discretion for the court to decide the motion without first conducting an evidentiary hearing into the allegations." *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 405; 651 NW2d 756 (2002) (internal quotation marks and citation omitted). "However, courts understandably look with skepticism upon a dissatisfied party's claim of fraud and insist on strict factual proof." *Id.* "Thus, where the party requesting relief fails to provide specific allegations of fraud relating to a material fact, the trial court need not proceed to an evidentiary hearing." *Id.* Here, DRE asserts that an evidentiary hearing would allow DRE to test Pullis's assertion that he "did not recall" the email when he gave his original affidavit or to explore whether Comerica had received any other information regarding the foreclosure sale of the disputed parcel. However, DRE's speculation about whether Pullis recalled the email or not is of no material consequence because the email, as discussed, did not actually notify him that the County had commenced tax foreclosure sale proceedings regarding the parcel. And, with respect to whether Comerica had received any additional information regarding the foreclosure sale of the disputed parcel, Pullis stated in his original affidavit that he conducted a search of Comerica's business records and attested to the

routine procedure for receiving such documents, but did not find any notice of the tax foreclosure proceedings related to the disputed parcel. Moreover, the County's Tax Administration System record indicated that the County did not generate a notice to Comerica. Thus, plaintiff failed to offer any evidence to indicate that Comerica actually received notice of the tax foreclosure proceedings on the subject parcel to support is claim of misrepresentation or fraud. Thus, the court's failure to hold an evidentiary hearing was not an abuse of discretion.

In sum, "[w]ell-settled policy considerations favoring finality of judgments circumscribe relief under MCR 2.612(C)(1)." *Rose v Rose*, 289 Mich App 45, 58; 795 NW2d 611 (2010). Where, as here, the parties have entered a settlement agreement electing finality on the issue, the court considering relief from that order must strictly apply MCR 2.612. *Id.* at 59. DRE failed to demonstrate mutual mistake, fraud, or misrepresentation required to set aside the circuit court's orders under MCR 2.612(C)(1), and the court did not abuse its discretion when it denied DRE's motion to set aside the receivership orders.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto
/s/ Thomas C. Cameron